# EXHIBIT C-1

E-FILED
IN MATTERS PROBATE
Submit: 8/2/2023 11:01 AM
Lucy Adame-Clark
CLERK PROBATE COURTS
BEXAR COUNTY, TEXAS
BY: _____
Dolores Zaragoza

NO. _____

2023PC02901

| | | |
|---|---|---|
| **MACKENZIE HILL,** | § | |
| *Plaintiff,* | § | |
| | § | **IN THE PROBATE COURT OF** |
| **v.** | § | |
| | § | **BEXAR COUNTY, T E X A S** |
| **UNIFI AVIATION, LLC, and** | § | |
| **THE ESTATE OF DAVID RENNER,** | § | _____ **JUDICIAL DISTRICT** |
| *Defendants.* | § | |
| | § | PVT PROCESS PERS CIT |

---

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND,**
**NOTICE OF RULE 194 REQUIRED DISCLOSURES,**
**AND MOTION FOR SCIRE FACIAS SUBSTITUTION,**
**AND CERTIFICATE OF LAST KNOWN ADDRESS**

---

**TO THE HONORABLE JUDGE OF THIS COURT:**

Comes now Plaintiff MACKENZIE HILL pleading against Defendants UNIFI AVIATION, LLC, and THE ESTATE OF DAVID RENNER and as grounds shows the following:

**1. DISCOVERY CONTROL PLAN LEVEL 3**

1.1.    Plaintiff intends to conduct discovery under Discovery Plan Level 3 pursuant to Rule 190.4 of the Texas Rules of Civil Procedure and affirmatively pleads that this suit is NOT governed by the expedited actions process in Texas Rule of Civil Procedure 169

**2. PARTIES**

2.1.    Plaintiff **MACKENZIE HILL** (hereafter "Mackenzie") is an individual who resides in Comal County, Texas.

Accepted on: 8/4/2023 8:38 AM

2.2.     Defendant **UNIFI AVIATION, LLC**, (hereafter "Unifi") is the largest aviation ground handling service in North America. It is a foreign limited liability company formed outside the State of Texas. Its registered principal executive office address is 950 E Paces Ferry, Suite 2000, Atlanta, GA 30326. Unifi may be served with process by sending the citation to its Texas registered agent as follows:

**Corporation Service Company d/b/a CSC**
**Lawyers Incorporating Service Company**
**211 E. 7th Street, Suite 620**
**Austin, TX 78701-3218 USA**

2.3.     Defendant **THE ESTATE OF DAVID RENNER**, is the Estate of David Renner, who died on June 23, 2023, in Bexar County, Texas. Plaintiff is unaware of any currently open probate of the Estate.

## 3. MOTION FOR SCIRE FACIAS SUBSTITUTION

3.1.     Plaintiff moves this Court to issue a Writ of Scire Facias as to the Estate of David Renner so that the Estate may be properly notified and represented in this lawsuit.

## 4. CERTIFICATE OF LAST KNOWN ADDRESS

4.1.     The deceased's last known address was 1300 W. Martin Street, San Antonio, Texas 78207 (a site called Haven for Hope, "Where Homelessness Ends and Healing Begins").

## 5. JURISDICTION AND VENUE

5.1.    This court has jurisdiction over this case, and the damages sought are within the jurisdictional limits of this court.

5.2.    Pursuant to Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code, venue is proper in Bexar County, Texas, because this is the county in which all or a substantial part of the events or omissions giving rise to this claim occurred. Specifically, the incident made the basis of this lawsuit occurred on the grounds and entirely inside the secure perimeter of the San Antonio airport, which lies entirely in Bexar County.

5.3.    Venue is proper in the Probate Court because the lawsuit concerns the Estate of a recently deceased person in Bexar County whose probate has not been concluded.

## 6. FACTS

6.1.    On Friday, June 23, 2023, Plaintiff Mackenzie Hill was a civilian passenger on Delta Flight 1111, returning home to Texas on a flight from Los Angeles. Mackenzie was in California for a church conference and graduation ceremony. Mackenzie was graduating from a 2-year program for equipping women for ministry. As a graduation gift for herself, Mackenzie decided to take herself to Disneyland for a day before flying home. Mackenzie's seat that day was 11A—directly above the captain's side engine.

6.2.    Mackenzie's return flight arrived back in San Antonio at 10:23 P.M., and like most travelers on late flights, she was ready to get home and get comfortable.



*Above Photograph: Plaintiff Mackenzie Hill in California on June 20, 2023*



*Above Photograph: Plaintiff Mackenzie Hill at Disneyland on June 21, 2023*

6.3.    Before June 23, Mackenzie loved to travel and fly—and she enjoyed picking the window seat because she liked watching the flight. As she always would, after the plane landed in San Antonio, Mackenzie watched from her window as it taxied to the gate.

6.4.    As the powerful Airbus A319 made its way from the runway to the gate, Mackenzie noticed something that caught her eye—it was a man coming uncomfortably close to the plane on the ground.

6.5     As she watched him closely approach the massive jet, she witnessed a horror so disturbing and so unusual that it would instantly make headlines around the world: the man was suddenly "ingested" into the engine of the airplane, and Mackenzie watched as the turbine essentially "shredded" his body.

6.6.    Mackenzie had her eyes directly on the gruesome scene, and she still has nightmares and flashbacks of seeing bits of the body being "spit out" as the jet engine pulverized the rest of the human remains.



*Above Photograph: Scene Photograph Showing the Ingestion Site*

6.7.    Physically and emotionally sickened by what she had just witnessed, Mackenzie then shut her window and tried her best to brace herself from the immense emotional distress that flooded into her. Flight crew demanded all passengers shut their windows, and the plane remained parked for approximately 15 minutes before passengers were allowed to leave.  Once allowed to leave the aircraft, Mackenzie asked the flight crew if she needed to stay behind and provide a statement, to which the flight crew declined—only later, it was determined that flight crew did not know that investigators on the ground <u>did</u> in fact want to take witness statements.

6.8.    Once released, Mackenzie left the airport as quicky as she could to the safety of her own home, where she tended to her suddenly inflicted Post-Traumatic Stress Disorder that has continued to cripple her ability to focus, work, leave her home, and caused relationship and communication problems with friends and family.

6.9.    The man who died in the "ingestion" was 27-year-old David Renner—a ground worker at the San Antonio Airport employed by Defendant Unifi Services. Making this incident even more shocking, it was quickly determined by the Bexar County Medical Examiner that Mr. Renner had intentionally taken himself into the "ingestion zone" of the airplane and caused his own death while knowing that innocent passengers and co-workers were present within line of sight. The death was ruled a suicide.

6.10.   Preliminary investigation of David Renner's wellbeing at the time of the suicide reveals that Unifi Services (the airport vendor he worked for) could have prevented this incident from occurring. Public social media posts by the deceased, statements by other crew, and statements by family members in the media suggest that Mr. Renner was <u>visibly</u> struggling with mental health problems near the time of his death and during his employment with Unifi. In

addition to alarming public statements he posted online concerning his mental health, news outlets have reported that Mr. Renner also had a substance abuse issue close to or during the time of Unifi's hiring and employment of Mr. Renner to work in a high-security environment.



*Above: Public Facebook post made by the deceased, David Renner, shared from "Keep the plug in the jug" stating: picturing seven skeletons engaging in what looks like a conversation, with the caption "MY OLD FRIENDS WAITING FOR ME TO RELAPSE".*



*Above: Public Facebook post made by the deceased, David Renner, picturing a triangle, inside of which is a black and white scene of a tree, on the right side depicting a swing and the left side a <u>noose</u>, with the sign for infinity below and the word "throne."*



*Above: Public Facebook post made by the deceased, David Renner, shared from "Depression quotes" stating: "I'm not evan a person anymore. I'm just stress and sadness."*



*Above: Public Facebook post made by the deceased, David Renner, shared from "Depression quotes" stating: "Have you ever just randomly started crying because you've been holding in all of these emotions and pretending to be happy for way too long?"*



*Above: Public Facebook post made by the deceased, David Renner, stating: "I NEVER LOST ANY FRIENDS WHEN I GOT SOBER I JUST REALIZED I NEVER HAD ANY," with Renner himself commenting "This right here to someone in need."*



*Above: Public Facebook post made by the deceased, David Renner stating: "I am the unwanted child in my family," on the main line, with the subtitle of "Abuse The Darkness Within Recovery through love and light".*



*Above: Public Facebook post made by the deceased, David Renner stating: "You can hate your demons with all that you are. You can yell and scream, curse them with all your heart. But at the end of the day, they're the only ones that see your scars. When you remove the mask that hides your face, they're the only ones that really know who you are."*



*Above: Public Facebook post made by the deceased, David Renner, shared from "Weird People" stating: "It has been said, 'time heals all wonds.' I do not agree. The wounds remain. In time, the mind, protecting its sanity, covers them with scar tissues and the pain lessens. But it is never gone." Renner commented about this post, "I like this.."*

6.11.   In a statement to the UK's Daily Mail, David Renner's brother, Joshua Renner said, "This isn't the first time David has tried something like this from my knowledge." He continued, "'There were other times. This time I thought it was different." Joshua also disclosed to the Daily Mail that David Renner struggled with substance abuse issues closely aligned with the timeframe he applied for and began work with Unifi. Joshua told the paper, "The reason I say that is because he was almost five months clean and living every day to the fullest," and that "David had been clean for over eight months, was in therapy, [was] actively taking his prescribed medication and had finally become the David we all knew he could be."

6.12.   Following Mr. Renner's death, some members of his family created an organization called "David's Legacy Foundation" and claim on social media to have established a 501(c)3 nonprofit classification—confirming their belief that Mr. Renner's death was suicide caused by long term mental illness.



6.13.   Also following his death, persons claiming to be Mr. Renner's family posted lengthy statements on social media detailing Mr. Renner's history of long-term mental health and substance abuse issues, including the following statement:

> David graduated in 2014, and after finding employment in Indianapolis he moved closer to his father and step-mother. It was during this time that David turned to illegal substances to "numb the pain". After being let go from his employment, David began what some would call a downward spiral. In 2017, David and his father got into an argument regarding a vehicle at which time David physically assaulted his father, who was left with no choice but tough love and had his son removed by police. Shortly after, Mr. Renner accepted a position in San Antonio, Texas, and relocated his family in June 2018.

*Above: Screen Shot of Facebook Post from RebekahAnn Renner,*
*claiming to be a family member of David Renner's.*

6.14.   On Facebook, a public statement was made that *"A friend who works for Delta at BWI said rumor has it he told a coworker he was going to do it and they thought he was joking so they didn't do anything. Not sure if that's true or not."* Admitting that Plaintiff cannot verify the truth of this statement, it does provoke concern as to whether Mr. Renner did in fact make outcries of this idea prior to his suicide. Plaintiff will gather the testimony of co-workers to examine this possible evidence prior to trial.



6.15.   Unifi employed Mr. Renner to work next to commercial passenger airplanes in close proximity to innocent passengers on board. Being that this environment (within the secured perimeter of the airport) is one of the most sensitive and secured in the country following the terrorist attacks of September 11, 2001, Unifi had an advanced duty to regulate which employees should have been allowed so close to passengers on the runway.

6.16.   According to TLO background searches on Mr. Renner, at the time of his death, he was living in a homeless shelter called Haven for Home, which advertises itself as a place "Where Homelessness Ends and Healing Begins."

6.17.   Mr. Renner had also recently faced potential criminal charges being arrested for "Criminal Trespass-Private Property" on April 12, 2022, in Bexar County, Texas. From online records, it appears that charge was filed but declined to be prosecuted.

6.18.   According to social media posts alleging to be from Mr. Renner's family concerning the details of his mental health, a statement was made by the family's purported representative that shortly before his move to San Antonio, Mr. Renner allegedly also physically assaulted his father, which led to Mr. Renner being "removed by police." This statement was provided as a press release from "BossWitch Designs" CEO RebekahAnn Renner, claiming to represent Mr. Renner's family in public media. The press release continues to detail many intimate details on the lifelong struggles Mr. Renner faced—leading Plaintiff to believe this was not a sudden onset of mental illness; it was pre-existing and publicly visible.

6.19.   The NTSB declined to investigate the incident as an aviation disaster, issuing the following statement: "The NTSB will not be opening an investigation into this event. There were no operational safety issues with either the airplane or the airport."

6.20.   The method of suicide Mr. Renner used is noteworthy to several other aviation events in the recent past that are relevant to examine the danger and trauma of a jet-engine "ingestion."

6.21.   First, in 2016, Jennifer Riordan (a civilian passenger) was killed when a piece of the engine turbine dislodged during Southwest Flight 1380 on April 17, 2018. Similar to the Plaintiff in this lawsuit, Ms. Riordan was sitting in a captain-side window seat when a piece of the plane's engine flew into her window causing fatal injuries. On that flight, fragments from the inlet and cowling struck the wing and fuselage and broke a window at Row 14 in the passenger compartment. The flight crew carried out an emergency descent of the aircraft and diverted it to Philadelphia. Had parts of the engine on Delta 1111 come into Mackenzie's window, she and other window passengers could have been killed.



*Above: Photograph of Southwest Flight 1380*

6.22.   Second, "bird strike" tests have been performed in aviation development for many years. Perhaps the most famous "bird strike" incident occurred in what is now known as the "Miracle of the Hudson," US Airways Flight 1549 flown by Captain Sully Sullenberger on January 15, 2009. On that flight, the plane lost both engines due to hitting flocks of geese. To avoid a collision on the ground, Captain Sully successfully landed the plane in the Hudson River in New York City. Photographs and videos of the landing were shared around the world. This flight demonstrates that the power of an ingestion of an object as small as a bird can be enough to completely destroy a jetliner.



*Above: Photograph of US Airways Flight 1549 in the Hudson River*

6.23.   Bird strike ingestion tests conducted on video depict that even with a body as small as a chicken, jet engines can be blown apart by ingesting them. An average chicken may only weigh 5 pounds (contrasted to the weight of a male adult human body), so the magnitude of the horror and violence caused by a human body would be far greater, more dangerous, and horrific than the chickens studied by airline engineers on film.

6.24.   Aside from flinging parts of the fast-moving engine into the plane, the explosion of the engine could have also started a fire on board—one of the most feared events in aviation. The fear of fire on board a commercial airplane is so significant that the FAA requires airlines to request all passengers to declare any lithium / lithium-ion batteries and electronic cigarettes, and forbids those products from being checked into luggage.



*Above: American Airlines Flight 1958 on Fire After "Bird Strike" Ingestion*

6.25.   The comparisons of Mr. Renner's ingestion and bird strike test ingestions are examined for two primary reasons: 1. They demonstrate the extreme danger that Mackenzie and all Delta 1111 passengers were in that day, and 2. Bird strike videos help others understand what Mackenzie saw first-hand, and why she is so traumatized and damaged by it.

6.26.   Mackenzie will never be able to remove the image of the horrifying suicide she witnessed, and she will always carry anxiety, mental anguish, and emotional distress from being traumatized by this nightmare. In addition, this incident has caused Mackenzie not to want to leave her home, and has ruined her love of travel forever. She remains in therapy today.

6.27.   This lawsuit represents only a fraction of the possible damage that could have been caused by this incident. Due to Unifi's decision to allow Mr. Renner in the secured area of the airport runway next to passenger jets, roughly 100 souls could have died on Delta 1111 on June 23, and the incident could have been one of the largest acts of domestic terrorism in American history, falling just short of the Oklahoma City bombing in 1995 with 168 dead. Additionally, it may never be known if Mr. Renner's intentions were only suicidal or also possibly homicidal (or worse) that day.



## 7.  CAUSES OF ACTION

## COUNT 1 – GROSS NEGLIGENCE IN HIRING, SUPERVISION, AND RETENTION as to UNIFI

7.1.    Unifi had a duty to control its employees in their actions at work and keep in place security and safety measures to keep commercial passengers safe during air travel.

7.2.    Upon information and belief provided in the mass media coverage of this lawsuit, it has been stated that Mr. Renner made the prior threat of "ingesting" himself into a passenger airplane prior to his death. Also, upon information and belief provided in the media, it has been reported that Mr. Renner handed a suicide note to a supervisor before his death. This is in addition to the prior mental health outbursts online, substance abuse problems, homelessness, prior suicide threats, and possible criminal charges that Unifi should have been aware of.

7.3.    Upon learning of such information, Unifi had a duty to remove or suspend Mr. Renner from at least the sensitive areas of the airport near commercial jets operating with innocent civilians on board. Unbelievably, Unifi hired and retained Mr. Renner (ignoring all the challenges he was facing) to work in a high-security safety position.

7.4.    Ultimately, as we now know, Mr. Renner did indeed intentionally jeopardize the lives of all Delta 1111 passengers that day when he compromised the engine of an active Airbus A319 full of innocent passengers.

7.5.    Unifi had a duty to supervise and regulate employee's actions, and failed to do so in the following ways:

    a.    Allowing Mr. Renner to work inside the secure perimeter of the airport;
    b.    Failing to respond to Mr. Renner's public mental crises; and
    c.    Failing to suspend David Renner from employment.

7.6.    Considering the gravity of allowing an engine explosion to occur next to a commercial flight full of passengers, Unifi's mistakes far exceed ordinary negligence and rise to the degree of recklessness for its gross endangerment of the lives of roughly 100 people.

7.7.    Unifi is liable to Plaintiff for the tort of Negligent Hiring, Supervision, and Retention, as it is defined by Texas Law as follows: (1) Unifi had the duty to hire, supervise, and retain competent employees; (2) Unifi breached that duty; and (3) Unifi's breach of that duty proximately caused damages the Plaintiff. *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 573 (Tex. App.—Amarillo 2010, pet. denied); *LaBella v. Charlie Thomas, Inc.,* 942 S.W.2d 127, 137 (Tex. App.--Amarillo 1997, writ denied).

7.8.    An employer is liable for negligent hiring, supervision, or retention when proof is presented that the employer hired an incompetent or unfit employee whom it knew or, by the exercise of reasonable care, should have known was incompetent or unfit, thereby creating an unreasonable risk of harm to others. *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex.App.--Fort Worth 2008, no pet. h.).  Negligence in hiring requires that the employer's "failure to investigate, screen, or supervise its employees proximately caused the injuries the plaintiffs allege." Additionally, there are many services available to airlines offering to screen potential employees' backgrounds—to include searches of past substance abuse and social media posts.

7.9.    To impose liability for negligent hiring, there must be evidence that the plaintiff's injuries were brought about by reason of the employment of the incompetent servant. *Dieter v. Baker Service Tools*, 739 S.W.2d 405, 408 (Tex. App.--Corpus Christi 1987, writ denied).  Here, Plaintiff Mackenzie's damages were directly caused by Mr. Renner and his employment with Unifi.

7.10.   Negligent hiring and negligent employment are akin to the doctrine of negligent entrustment of an automobile. *Deerings West Nursing Center v. Scott*, 787 S.W.2d 494, 495 (Tex. App.—El Paso 1990, writ denied). The tort of negligent hiring is different from the doctrine of *Respondeat Superior* because it addresses the risk created by exposing the public to a potentially dangerous individual, while the doctrine of *Respondeat Superior* is based on the theory that the employee is the employer's agent.  *Akins v. Estes*, 888 S.W.2d 35, 42 (Tex. App.--Amarillo 1994), *aff'd and rev'd in part*, *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287 (Tex. 1996); *see also LaBella v. Charlie Thomas, Inc.*, 942 S.W.2d at138.  Negligent hiring requires only some connection between the plaintiff's injury and the fact of employment. *Dieter v. Baker Serv. Tools*, 739 S.W.2d at 408. As discussed in this lawsuit, Mr. Renner posed an enormous threat to the lives of the public on Delta 1111, and his mental condition was public, visible, and should have been addressed by Unifi prior to being allowed to enter the secure area of the airport.

7.11.   In this lawsuit, Plaintiff Mackenzie was damaged by the actions of Unifi's employee. Evidence shows that a reasonable employer would <u>not</u> have allowed Mr. Renner to work in the secure area next to passenger airliners and innocent civilians—and all events that unfolded on June 23 were caused because of Unifi's negligence in the hiring, supervision, and retention of David Renner.

## COUNTS 2 and 3 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND RESPONDEAT SUPERIOR AS A COMMON CARRIER

7.12.   "The duties and liabilities of a common carrier in Texas and the remedies against the carrier are the same as prescribed by the common law." TEX. TRANSP. CODE § 5.001(a)(1). For at least 220 years (and 165 years in Texas), the common law has required common carriers to exercise a "high degree of care" toward their passengers. This duty does not make carriers strictly liable as insurers or require them to employ the "utmost," "highest," or "greatest" degree of care. *Gulf, Colo. & Santa Fe Ry. Co. v. Conley*, 260 S.W. 561, 563 (Tex. 1924). But in contrast to the ordinary-care standard, the Texas Supreme Court has repeatedly held that a common carrier owes a duty to its passengers to act as "a very cautious and prudent person" would act under the same or similar circumstances. *Speed Boat Leasing v. Elmer*, 124 S.W.3d 210, 212 (Tex. 2003) (*per curiam*) (quoting *Dall. Ry. & Terminal Co. v. Travis*, 78 S.W.2d 941, 942 (Tex. [Comm'n Op.] 1935)); *see Mount Pleasant Indep. Sch. Dist. v. Lindburg*, 766 S.W.2d 208, 213 (Tex. 1989); *City of Dallas v. Jackson*, 450 S.W.2d 62, 63 (Tex. 1970).

7.13.   Unifi, as Mr. Renner's employer, and as a common carrier, had an extremely heightened duty to provide safe transport to all airline passengers, as aviation security is amongst the most stringent security civilians encounter. Unifi was Mr. Renner's employer, and it could have refused to hire him or terminated his employment prior to his tragic death for the myriad of reasons described in this lawsuit. Given the evidence presented above regarding drug use, mental health outcries, and other troublesome history, Mr. Renner had effectively put Unifi "on notice" that something bad could happen by allowing him to work in such a secure site for public safety concerns. Nevertheless, Unifi disregarded its chance to prevent this incident from happening all together by putting Mr. Renner, in his mental health crisis, only feet away from a jet's active engine and many innocent passengers.

7.14.   Mr. Renner's death on June 23, 2023, occurred in the course and scope of his employment as a ground worker with Unifi. According to the Bexar County Medical Examiner, the death was ruled to be an intentional suicide. Some reports in the media have even reported that Mr. Renner allegedly handed a suicide note to his supervisor just before he jumped.

7.15.   Unifi recklessly disregarded the dangers a person with Mr. Renner's mental struggles presented while allowing him in close physical contact with planes carrying innocent civilian passengers (considering the risks of aviation disasters described herein).

7.16.   Unifi's conduct was a proximate cause of Plaintiffs' injuries and damages as pled herein. Plaintiff specifically pleads that nothing she did contributed to the cause of the damages she sustained.

7.17.   Plaintiff additionally asserts liability under the doctrine of *Respondeat Superior*, in that:

a)   Plaintiff was damaged as the result of the acts or omissions of employees of Unifi, including David Renner; and

b)   At the time of said acts or omissions, Mr. Renner was acting in the course and scope of his employment with Defendant Unifi, and in furtherance of Defendant Unifi's business.

## COUNT 4 – DECEPTIVE PRACTICES AS TO UNIFI

7.18.   As a customer purchasing a ticket on a major airline, Plaintiff was a "consumer" of Defendant Unifi's services under the definition of the Texas Deceptive Trade Practices Act.

7.19.   According to Unifi's website, the company advertises "a culture where safety is never compromised for any other business priority."



7.20.   As a consumer of commercial air travel, especially in the post-9/11 world, Mackenzie relied upon all those businesses her ticket paid for to ensure her safety. In purchasing her ticket, the money Mackenzie spent benefitted the airline, the aircraft, the airport, and ground crew—to include Defendant Unifi.

7.21.   Because Unifi was so grossly reckless in the retention and management of putting Mr. Renner next to live engines of commercial planes carrying innocent passengers, Unifi strongly veered from its promise of safety to employees and customers in order to use low-cost, improperly vetted labor on the ground.

7.22.   Advertising the promise of safety to the extremity of caring for employees, customers, and even the environment—and then internally recklessly allowing a person of Mr. Renner's struggles in high security situations—is deceptive and misleading.

7.23.   It was also deceptive and misleading for Unifi to advertise "risk identification" as one of its commitments to safety and then, internally, to create a culture that allowed a person with a history of substance abuse, homelessness, and suicidal tendencies to work next to commercial jets and innocent passengers.



7.24.   There is no requirement that the consumer be in privity (in a direct contractual or business relationship) with the defendant—only that the claimed violation occurred in connection with the consumer's transaction. *Amstad v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996). The consumer is simply required to be the *intended beneficiary* of goods or services. *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex.1997). "The connection can be demonstrated by a representation that reaches the consumer or by a benefit from the second transaction to the initial seller." *Todd v. Perry Homes*, 156 S.W.3d 919, 922 (Tex.App.-Dallas 2005, no pet.).

7.25.   In this lawsuit, Plaintiff Mackenzie was indeed a consumer of the safety services Unifi promised to deliver—but in reality, Unifi grossly failed and grossly misrepresented its quality of safety and risk assessment, constituting deceptive trade practices under the Texas Deceptive Trade Practices Act, Tex. Bus. & Comm. Code, Title 2, Chapter 17.

## 8.  DAMAGES

8.1.     As a result of the acts or omissions of the Defendants, as set forth herein, Plaintiff suffered debilitating, life-long emotional distress and mental anguish.

8.2.     In reading Mackenzie's text messages from that day, it is clear that she was both a very close witness, describing the incident "literally happened by my window," and severely traumatized, stating "my whole body is shaking."



*Above: Texts with Patrick Renner, Plaintiff's husband, immediately following the incident.*



*Above Left: Text with Plaintiff's husband.*

*Above Right: Text with Plaintiff's friend, who was picking her up from the airport.*



*Above: Texts with Plaintiff's friend, Andrew, who was picking her up from the airport.*

8.3.    Accordingly, Plaintiff requests the jury to award damages in the following areas:

    (a)    Mental anguish, both past and future;

    (b)    Physical impairment in the past;

    (c)    Loss of wage-earning capacity, both past and future;

    (d)    DTPA treble damages;

    (e)    Reasonable and necessary medical expenses, both past and future; and

    (f)    Attorney fees for DTPA claims.

## 9.  EXEMPLARY DAMAGES

9.1.    Plaintiffs will ask the trier of fact to determine and award exemplary damages against the Defendants as allowed by law in accordance with Tex. Civ. Prac. & Rem. Code Sec. 41.008, as well as treble damages provided in accordance with the Texas Deceptive Trade Practices Act.

## 10.  JURY DEMAND

10.1.    Plaintiff hereby demands a trial by jury on all issues and tenders the appropriate fee.

## 11.  PRE-JUDGMENT INTEREST

11.1.    Plaintiff pleads for prejudgment interest as allowed by Art.5069-1.05 §6 (a) of V.A.T.S.). Plaintiff specifically plead for prejudgment interest as an element of damages that Defendants should be legally obligated to pay as a result of the bodily injuries incurred by Plaintiff.

## 12.  REQUIRED DISCLOSURES

12.1.  Under Texas Rule of Civil Procedure 194, within 30 days of filing their first answers or general appearances, Defendants must, without awaiting a discovery request, provide to Plaintiff the information or material described in Rule 194.2, 194.3, and 194.4 of the Texas Rules of Civil Procedure.

## 13.  NOTICE OF RULE 193.7

13.1.  Pursuant to Texas Rule of Civil Procedure 193.7, Plaintiff gives notice to Defendants that all documents and things produced by Defendants may be used at any pretrial proceeding and/or the trial of this case without the necessity of authenticating said documents and things.

## 14. CLAIM FOR RELIEF

14.1.  Pursuant to TRCP Rule 47(c), Plaintiff seeks only monetary relief over $1,000,000.00, including damages of any kind, penalties, court costs, expenses, prejudgment interest, and attorney fees.

## PRAYER

Plaintiff prays for Defendants to be cited to appear and answer herein; that she have a trial by the Jury; that she have judgment against Defendants for a sum within the jurisdictional limits of the Court, with interest both pre-judgment and post-judgment, jointly and severally; for costs of suit; and for such other and further relief, general and special, legal and equitable, to which Plaintiff may be justly entitled.

Respectfully submitted,

By:_____

L. JAMES WOOD
Texas Bar No. 24076785
james@lineofdutylaw.com

**THE JAMES WOOD LAW FIRM, PLLC**
500 W. 2nd St, STE 1900
Austin, Texas 78701
P:      512.692.9266
F:      512.686.3152
W:      lineofdutylaw.com
CC:     natalie@lineofdutylaw.com

E-File Service Address: eservice@lineofdutylaw.com

**ATTORNEYS FOR PLAINTIFF**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Natalie Jordan on behalf of Lewis Wood
Bar No. 24076785
natalie@lineofdutylaw.com
Envelope ID: 78123487
Filing Code Description: Plaintiff's ORIGINAL PETITION (OCA)
Filing Description: Jury Demand, Notice of Rule 194 Required Disclosures, and Motion for Scire Facias Substitution, and Certificate of Last Known Address.
Status as of 8/4/2023 8:39 AM CST

Associated Case Party: MacKenzie Hill

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lewis JamesWood | | james@lineofdutylaw.com | 8/2/2023 11:01:56 AM | SENT |
| James Wood | | contact@lineofdutylaw.com | 8/2/2023 11:01:56 AM | SENT |
| Nicole Regan | | nicole@lineofdutylaw.com | 8/2/2023 11:01:56 AM | SENT |
| Natalie Jordan | | natalie@lineofdutylaw.com | 8/2/2023 11:01:56 AM | SENT |